# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### Civil No. 0:07-CV-1295

---------------------------------------------------------

John O. Murrin III and DeVonna K.
Murrin, Husband and Wife,

       Plaintiffs,

  -vs-

                            **DECLARATION OF JOHN O.**
                            **MURRIN IN SUPPORT OF**
                            **COURT JUDGMENT PURSUANT**
                            **TO FED. R. CIV. P. 55(b) (2)**

Avidigm Capital Group, Inc.,
Steven J. Mattson,

       Defendants.

---------------------------------------------------------

State of California   )
                     )§
County of Orange   )

     I, John O. Murrin, certify and declare under penalty of perjury that the

following facts are true and correct to the best of Declarant's information and

belief in support of entry of judgment for damages.  Towards that end, Declarant

incorporates by reference all exhibits previously filed in conjunction with other

motions in this case, including declaration/affirmation of DeVonna K. Murrin

dated August 12, 2007 (Exhibit 42).   Declarant and DeVonna K. Murrin are

husband and wife of 30 years and Plaintiffs herein.

## Declaration Regarding Facts

1.      Plaintiffs met Steven J. Mattson and other representatives of Avidigm

Capital Group in the late part of 2003.  Plaintiffs were seeking investment

opportunities and were introduced to Avidigm as a potential investment vehicle.

Avidigm's business initially involved purchasing real property at sheriff's

foreclosure sales and then reselling those properties at a profit.  Avidigm's also

evolved into a land development operation. Steve Mattson was introduced to the

Murrins as President and C.E.O. of Avidigm.  He was the sole shareholder of

Avidigm.  He was an influential factor in the Murrins' investment decision and

was readily available to the Murrins as a spokesman and salesperson for Avidigm.

All contacts with others working with or through Avidigm, like the attorneys

(Davisson and Fischer) or the CFO (Mathew Mosher) or the foreclosure consultant

(James Hoffman) or anyone else the Murrins came in contact with at Avidigm was

through or with Mattson's permission.

2.      Plaintiffs made two investments with Avidigm through Mattson and

others in the later part of 2003 and early part of 2004 which were both short term

investments and were repaid timely according to their terms.

3.      In the spring or summer of 2004, Avidigm approached the Murrins about making a third investment of $600,000.00 in Avidigm.  Before agreeing to invest in such a substantial amount, the Murrins requested that their accountant review Avidigm's financial books and records.  Avidigm sent the Murrins' accountant copies of the Balance Sheet and Profit & Loss for the period 9/1/03 to 6/30/04 (Exhibit 1).  Those records showed that Avidigm had a gross profit of $1,143,910.51 with a net profit of $225,170.90.  It also showed a category of consulting expenses, in the amount of $30,331.86.  This turned out to be false and fabricated information.  So called consulting expenses were actually over $350,000.

4.      The accountant assumed the information supplied was correct (it was not), but recommended that the Murrins obtain good security for their investment. The Murrins, following this recommendation, made a security requirement for their investment in Avidigm.   The requirement they made to Avidigm was that they be provided security in Avidigm-owned real property equivalent to one and one-half times their investment.  This was a requirement made and agreed upon between the Murrins and Mattson.

5.      The Murrins met with Mattson and other representatives of Avidigm on August 20, 2004, to discuss a $600,000 investment in Avidigm, the terms under which they would invest, and the details of a prospective contract.  Again, the

requirement that security be given the Murrins in Avidigm real property equal to one and one-half times the amount of the investment was agreed to as well as an understanding that the Murrins would not invest in land development projects.  The security was originally to be on foreclosed properties Avidigm had purchased in which Avidigm had at least 27% of net equity.  All this was communicated and agreed upon with Defendant, Steven J. Mattson, who advised the Murrins that Avidigm's real estate equity, was in the millions and he was looking for funds to enlarge Avidigm's profit center which was quite profitable and expanding, to seize opportunities in the foreclosure marketplace.  To prove this, he told the Murrins he was advised by a reputable auditing firm that they would be issuing an excellent "unqualified audit" supporting Avidigm's profitable operations as Mattson represented it to be as stated above.

6.     A Security Agreement, Secured Promissory Note and personal Guaranty of Steven J. Mattson were subsequently executed (Ex. 2, 3, and 4 respectively).   The Agreement was that the Murrins would invest $600,000.00 only if Avidigm would provide them with security in real property that had equity of 150% of the amount of their investment with the security being in the form of mortgages on real property owned by Avidigm.  Thus, pursuant to the agreement, Avidigm was to secure the Murrins on property or properties with equity of at least $900,000.00 and if subject to other encumbrances, have equity above prior

encumbrances of 27%. These conditions were reflected in the agreement the parties signed. See Exhibit 2 at §1.  The Murrins wired $600,000.00 to Avidigm on August 31, 2004 after the agreements were signed at Mattson's request.  Mattson and Avidigm requested in advance time to put the security in order and assigned the attorneys and others to the task.

7.     Pursuant to the above, a mortgage was given the Murrins with representations by Mattson and others (including the company attorneys) that the property upon which they were secured had equity of at least $900,000.00 pursuant to an appraisal Avidigm had obtained and was excellent security.  The mortgage was given to the Murrins to prove it.  It purported to secure the Murrins on a 32-acre campground portion of some acreage Avidigm owned in North Dakota known as the Rio Sheyenne property.  The legal description on the mortgage was as follows:

> Lots 23 and 23A, Rio Sheyenne Estates Addition, in part of N ½ of Section 4, Township 135 North, Range 52 West, and part of S ½ of Section 33, Township 136 North, Range 52 West, all in the County of Richland, North Dakota.

> (See Exhibit 5). According to the abstractor, at Exhibit 17, there is no Lot 23, only at Lot 23A valued at $200.00.

> A.     This property was represented at the meeting of August 20, 2004, to be owned by Avidigm or under its control by option or similar agreement and worth around $900,000.00.  It was also represented there that Avidigm had been offered $750,000 from Great Plains Software to buy the campground portion only.  All of this was false and fabricated.  Avidigm did not even own the North Dakota property

in August, 2004 (see Exhibit 38, p. 1, para. 4 and also Exhibit 44), and had to use some of the Murrins' money to buy it.

B.    Avidigm purchased the entire North Dakota property of 122 acres for $365,000.00 with some of the Murrin's money and subdivided the 32-acre campground out of it, which they represented to the Murrins had equity of $900,000.00 and thereby excluded the Murrins from security on the remaining majority of the acreage.

C.    Avidigm was never profitable. It was a ponzi scheme and Mattson, with others, used it to launder or misappropriate money over to themselves or their sham entities designed to fool and dupe the Murrins and others. See real estate expert report of Dan Coutolenc, Doc. 375, Exhibit 691, also attached hereto as Exhibit 39 and report of forensic accountant Bradley Mickelson, Exhibit 40 and his second report Doc. 735, Exhibit 731a, also attached hereto as Exhibit 41. Also, Avidigm claimed to own property at foreclosure sales as their property to investors and to make their assets appear larger. In reality, 90% of those properties were redeemed by the homeowners, leaving Avidigm without the property (Watzke Statement Under Oath., Exhibit 18, p. 32). Avidigm would obtain loans on those properties when they purchased them at the foreclosure sales. When the homeowners redeemed the property, Avidigm left lenders without security. This became the basis of many lawsuits particularly the Bankwest and Midwest suits referred to herein. (Doc. 131-6 and Bankwest v. Avidigm, et al, Hennepin County, Court File No. 27 CV 06-2299, Doc. 131-7). The director of acquisitions, Phil Watzke, admits this in his deposition (Statement Under Oath, p. 30). This further substantiates that it was a ponzi scheme. He admits that after taking out the loan to buy the foreclosed property, Avidigm was actually the recipient of the redemption money paid by the homeowners to "get" the property out of foreclosure. They were keeping this money and using it to finance the continued operation. The Bankwest and the Midwest lawsuits (Doc. 131-6 and Bankwest v. Avidigm, et al, Hennepin County, Court File No. 27 CV 06-2299, Doc. 131-7) are all about this and the fact that Avidigm was keeping this money after these bank investors loaned the loaned the money in the first place.

D.  Had Avidigm secured the Murrins by way of mortgage on the full campground portion of the Rio Sheyenne property in North Dakota as promised, they still committed a fraud upon the Murrins. The North Dakota property instead of having value in the neighborhood of $900,000.00 as indicated by Avidygm to the Murrins, had no such value and little, if any, equity and certainly not the 27% equity required. It was purchased by Avidigm in November of 2004 for $365,000 (Exhibit 45). The campground portion of it (which was the only portion Avidigm and Mattson were using to secure the Murrins) is only about one-fourth of the entire property purchased for $365,000 (see appraisal, Exhibit 38 showing the property was 128.93 acres, plus an additional 9.97 acres and indicating that 30.59 acres will be maintained as the campground). Mattson, before securing the Murrins, gave a mortgage to Midwest Bank for $292,000 for the entire acreage (Exhibit 16).

E.  The North Dakota property was also hypothetically appraised as having the potential value of $450,000 if everything was stated therein was completed. See Exhibit 38. None of that was done and it was also hypothetical. It was fraudulent to represent a hypothetical appraisal as being an actual appraisal. Using the hypothetical appraisal was a common fraudulent practice of Avidigm. They would mislead investors into thinking they had security at some value which was not the actual value. Avidigm tried to pass off hypothetical appraisals as actual certified appraisals to the Murrins when Avidigm was presenting other additional properties to the Murrins. In Declarants investigation, he found the use of these hypothetical appraisals being frequently used. One example of this is property in South Dakota where Dan Gedatus in an affidavit states that his client was a victim of being induced to invest through similar hypothetical appraisals.

F.  Mattson and Avidigm were taking money out of the property in every way possible. This was undoubtedly part of Avidigm's and Mattson's *modus operandi* because this property and most of their other property, especially the foreclosed property originally promised as security to the Murrins, was utilized as disguised security to other investors and banks. Avidigm investors, banks, and the Murrins were all offered phony or disguised security to create a false sense of security. Once Avidigm obtained an investor's money, it was

generally Avidigm's *modus operandi* to keep as much of it as possible, while feigning half-hearted efforts at repayment or compliance with any agreement. They barely did this for the Murrins. The Murrins' investment is typical of what they did to scores of other banks and investors. This is borne out by casers alleging the same kind of thing. See Midwest Bank v. Avidigm, Becker County, Court file No. C3-06-354 (Doc. 131-6 and Bankwest v. Avidigm, et al, Hennepin County, Court File No. 27 CV 06-2299, Doc. 131-7, pp. 1-17.

G.    This North Dakota property never had any equity. It was 30.59 acres of a 128 acre property which Avidigm encumbered for another loan to Midwest bank on the entire 128 acres before the Murrins security was placed upon it.   The property was encumbered by this bank for $292,000.   By looking at the appraisal (Exhibit 38), one can easily determined that the price per acre obtained originally for the property was $2,635 per acre.  That means the campground portion involving 30 acres would be worth about $78,000. Since there was an encumbrance on the property for $292,000, there was no equity there even assuming the campground had some more value than the rest. Declarant also talked to and visited realtor in the area and formulated an opinion that that the campground was worth less than the mortgage of $292,000 by far.  It also should be noted that the Murrins never realized any value from it as it went up for foreclosure sale and after investigating the situation it was still determined by them not to be worth it  Eventually, the  bank foreclosed upon it leaving no value for the Murrins.

H.    In August, 2005, Mattson specifically told the Murrins at a noon luncheon at the Machine Shop, a restaurant in Woodbury that they had excellent security in the North Dakota property for $900,000 which has turned out to be absolutely false, and part of the overall operation of deception Mattson and Avidigm were conducting.

I.    Even the foreclosed property proffered initially to the Murrins to induce investment that was represented as having $931,000 of equity (Exhibit 12) of  equity to secure them never turned out to be true. See Declaration/Affirmation of DeVonna Murrin (Exhibit 42, paragraphs 24 and 25).  See also Real Estate Expert, Dan Coutolenc's report, Exhibit 43.

J.      It is Declarent's opinion, supported by numerous independent experts, employed by Declarant, who conducted their own investigations, that the Avidigm operation was entirely fraudulent and one capable of being called a ponzi scheme.  It was also a consortium of fraudulent and deceptive activities.   It was always insolvent. (see report of Accountant Bradley Mickelson, Exhibit 41.

K.      The Audit that was supposed to show that Avidigm was a profitable, legitimate operation was based upon fabricated transactions as the above reports also exemplify and Declarant has been able to substantiate.  Mattson and Avidigm's Answer, Crossclaim and Third Party Complaint (See Doc 389 (2)) outline their involvement in the loss of $10 to $20 million dollars and further substantiate the enormous fraud associated with Avidigm.  Mattson guaranteed $10.4 million of it that appears never to have been paid back to this day.  Id at paragraph 46.  At paragraph 80, Mattson mentions being responsible for losses of $20,000,000.   Id.  Avidigm was never a viable legitimate or profitable ongoing enterprise although it was represented as such to the Murrin.  Declarant believe this is verifiable by all he has reviewed and tried to contain herein but it is also verified by opinions of  the independent expert witnesses that is included herein and is part the record from before.   Also declarent directs the reader to the additional report of accountant Bradley Michelson who did a more specialized report about the money distributed out of Avidgim and its legitimacy.  The full report is contained in Exhibit 46 attached hereto but includes the following statement:

"Avidigm was a tool for fraud and improper income distribution used by and manipulated by AFS to perpetuate fraud and deceit upon investors and creditors and to enrich its owners, shareholders of… Avidigm was a front for persons attempting to divert money raised by Avidigm.  Avidigm procured its money through ill-gotten and illegal ways as described in my previous report. "

Declarant believes he has conducted a thorough investigation and as a lawyer with expertise in this area and what he has found and discovered, it can be honestly said that this Avidigm's operation engaged in raising money as above described fraudulently and then

laundering it out the door to  Mattson and the other co-conspirators associated with Avidigm.

.

8.      In approximately August, 2005, prior to the date the principal was to be repaid, Mattson and other representatives of Avidigm met with the Murrins and requested an extension of the loan until such time as the Rio Sheyenne property was sold or for one year, whichever came first.  The Murrins, after being assured that Avidigm's business was doing well, that it was profitable, and after having received the unqualified audit, agreed to the extension.  The Murrins had received a copy of an unqualified audit in approximately December, 2004, that indicated that Avidigm was a profitable company and therefore believed Mattson when he stated that Avidigm was doing well (see audit, Exhibit 6).  It turned out the audit was fabricated to make Avidigm look profitable when it was not.  See Deposition of Avidigm accountant, Linda Roxbury, Exhibit 30, p. 48, lines 1-7; P. 58-59; p. 80, lines 9-13.   Further, the records provided to the Murrins and their accountant prior to the August 20, 2004 meeting, were falsified to make Avidigm look profitable when it was not (see Gann Affidavit, Exhibit 7).  The financial statements given to the Murrins and their accountant failed to report about $350,000.00 that went to insiders (CEO Mattson and CFO Mosher) as consulting fees.

9.      The Murrins believed they were fully secured for their investment. They were advised at the Meeting in summer of 2005 that they had excellent

security on the North Dakota property and that the value of the equity it was secured on was in the neighborhood of $900,000.  They were always being timely paid $11,000.00 per month as interest pursuant to the agreement until January 18, 2006.

10.     The amount of Plaintiffs' original investment was $600,000.00, no part of which has been paid back and with accrued interest of $558,000, the loss through February 28, 2010 on  the breach of contract claim is $1,158.000.00. Alternative to the breach of contract loss is $900,000.00, the value of the equity promised as security, but not delivered.

11.     That the Secured Promissory Note, (Exhibit. 3), executed between Plaintiffs  and  Steven J. Mattson on behalf of Avidigm Capital Group, Inc. provided that "interest shall accrue on the unpaid principal balance at the rate of Twenty Two Percent (22%) per annum calculated on the basis of actual days elapsed and a 360 day year."  Therefore, interest continues to accrue at $366.66 per day.  Also, according to the Secured Promissory Note, "Each monthly payment of interest shall be Eleven Thousand Dollars ($11,000) provided that Maker has not made prepayment of any portion of the Principal sum."

12.     That interest payments were made on the above secured promissory note through December, 2005.  No interest payments were made as of January, 2006 and no portion of the principal has been paid to date.

## Declaration as to Amount Due

13.   That the amount of interest accumulated as of  March 24, 2008, 2010,

is as follows:

| Interest Due for Month of: | Date Paid | Amount of Interest Paid | Check Number | Interest Due: |
|---|---|---|---|---|
| September, 2004 | 9/30/2004 | $11,000* | #10056 | --00-- |
| October, 2004 | 10/29/04 | $11,000 | #10180 | --00-- |
| November, 2004 | 11/30/2004 | $11,000 | #20058 | --00-- |
| December, 2004 | 12/30/2004 | $11,000 | #20214 | --00-- |
| January, 2005 | 1/31/2005 | $11,000 | #20418 | --00-- |
| February, 2005 | 3/2/2005 | $11,000 | #20545 | --00-- |
| March, 2005 | 3/31/2005 | $11,000 | #20644 | --00-- |
| April, 2005 | 5/2/2005 | $11,000 | #20770 | --00-- |
| May, 2005 | 5/31/2005 | $11,000 | #20918 | --00-- |
| June, 2005 | 6/29/2005 | $11,000 | #21050 | --00-- |
| July, 2005 | 7/28/2005 | $11,000 | #21269 | --00-- |
| August, 2005 | 8/30/2005 | $11,000 | #21443 | --00-- |
| September, 2005 | 10/3/2005 | $11,000 | #21603 | --00-- |
| October, 2005 | 11/1/2005 | $11,000 | #21719 | --00-- |
| November, 2005 | 11/30/2005 | $11,000 | #21840 | --00-- |
| December, 2005 | 1/23/2006 | $11,000 | #21956 | --00-- |
| January, 2006 | | --00-- | | $11,000 |
| February, 2006 | | --00-- | | $22,000 |
| March, 2006 | | --00-- | | $33,000 |
| April, 2006 | | --00-- | | $44,000 |
| May, 2006 | | --00-- | | $55,000 |
| June, 2006 | | --00-- | | $66,000 |
| July, 2006 | | --00-- | | $77,000 |
| August, 2006 | | --00-- | | $88,000 |
| September, 2006 | | --00-- | | $99,000 |
| October, 2006 | | --00-- | | $110,000 |
| November, 2006 | | --00-- | | $121,000 |
| December, 2006 | | --00-- | | $132,000 |
| January, 2007 | | --00-- | | $143,000 |
| February, 2007 | | --00-- | | $154,000 |
| March, 2007 | | --00-- | | $165,000 |
| April, 2007 | | --00-- | | $176,000 |
| May, 2007 | | --00-- | | $187,000 |
| June, 2007 | | --00-- | | $198,000 |
| July, 2007 | | --00-- | | $209,000 |
| August, 2007 | | --00-- | | $220,000 |

| | | |
|---|---|---|
| September, 2007 | --00-- | $231,000 |
| October, 2007 | --00-- | $242,000 |
| November, 2007 | --00-- | $253,000 |
| December, 2007 | --00-- | $264,000 |
| January, 2008 | --00-- | $275,000 |
| February, 2008 | --00-- | $286,000 |
| March, 2008 | --00-- | $297,000 |
| April, 2008 | --00-- | $308,000 |
| May, 2008 | --00-- | $319,000 |
| June, 2008 | --00-- | $330,000 |
| July, 2008 | --00-- | $341,000 |
| August, 2008 | --00-- | $352,000 |
| September, 2008 | --00-- | $363,000 |
| October, 2008 | --00-- | $374,000 |
| November, 2008 | --00-- | $385,000 |
| December, 2008 | --00-- | $396,000 |
| January, 2009 | --00-- | $407,000 |
| February, 2009 | --00-- | $418,000 |
| March, 2009 | --00-- | $429,000 |
| April, 2009 | --00-- | $440,000 |
| May, 2009 | --00-- | $451,000 |
| June, 2009 | --00-- | $462,000 |
| July, 2009 | --00-- | $473,000 |
| August, 2009 | --00-- | $484,000 |
| September, 2009 | --00-- | $495,000 |
| October, 2009 | --00-- | $506,000 |
| November, 2009 | --00-- | $517,000 |
| December, 2009 | --00-- | $528,000 |
| January, 2010 | --00-- | $539,000 |
| February | -00-- | $550,000 |
| March (24 days x $366=$8784) | -00- | $558,000 |

14.    Plaintiffs calculated interest to the date of the default prove up hearing.

15.    That the total principal  of $600,000 and accumulated interest due and owing Plaintiffs as of March 24, 2010, is $558,000.00, for a total due and owing of $1,158.000.00.

16.     Pursuant to Minn. Stat. §604.14, Plaintiffs are entitled to an additional $600,000.00 representing 100% of the $600,000.00 stolen from Plaintiffs.

17.     The alternate value of the breach (see paragraph 14 above) of $900,000.00 for the lost security they were purposely cheated out of is also an appropriate way to calculate the loss due to the intentional and willful and deliberate deception in not providing the Murrins with the appropriate security.

18.     That Plaintiffs have incurred substantial attorneys' fees and costs in investigating the loss of their investment and the lawsuits to try to recoup their loss.

19.     The Murrins have a contract which allows for payment of all costs of collection and attorney fees. Exhibit 3 page 3. That the Murrins have incurred substantial attorneys' fees and costs in investigating the loss of their investment and the lawsuits to try to recoup their loss. The majority of expenses for collection and attorney fee occurred from 2006 through 2008. That is all that is being submitted.  No time for the undersigned, but expenses in collection allowed by contract are submitted

20.     The expenses occurred as of June 10, 2008, were up to $490,425.67 as set forth in Exhibit 36.  DeVonna Murrin made an agreement with Attorney Chris LaNave to pay him $35.00 per hour, but that if the Court allowed Plaintiffs to seek the attorney's fees, then for an additional higher amount would be pursued against

the culpable party after the Murrins were made whole from their losses. LaNave lists bills for his time at $150.00 per hour which is a rate deemed reasonable and the Murrins do not oppose this if the court finds that to be a reasonable amount. This would allow Mr. LaNave to be able to be paid the difference between that hourly rate and what the Murrins had already paid him if the Murrins are made whole and it is paid or through the assets of the Defendants herein. Mr. LaNave is currently threatening litigation regarding his right to receive a higher attorney's fees with the Murrins at $150.00 per hour rate despite the fact that those fees have not been awarded yet by the court and have not been collected from any party. Thus, the legal work listed by Chris LaNave in Exhibit 36 show his billings at $150.00 per hour. The actual amount paid by the Murrins pursuant to this arrangement was $72,061.50. However, as Mr. LaNave is now seeking the higher rate, and it is believed a reasonable one for a lawyer doing what he did, it is reasonable that said rate be requested as part of this judgment.

21.     Declarant estimates that half the amount listed in Exhibit 36 could be applicable to any of the Avidigm cases the Murrins commenced. The Murrins commenced four of them. It would be impossible to separate which expense or fee was related to each case or party because of the overlap. For example, expert fees may have been charged to one case just for ease of accounting, but was equally valuable in all cases and absolutely necessary to properly prosecute Avidigm and

Mattson in this case.   This case actually started out as a case venued in North

Dakota which was dismissed based upon lack of venue/jurisdiction.   Therefore,

expenses from that case are deemed very applicable and part of the costs of

collection.   Nonetheless, to be more than fair, Declarant is requesting only half the

amount in Exhibit 36 to take into consideration the fact not all these expenses may

be related to the immediate Avidigm and Mattson prosecution.    Thus, Declarant

believes $245,212.50  (one half the amount contained in Exhibit 36) is a fair figure

to use for legal fees and collection expenses attributable to pursuing Mattson and

Avidigm to bring them to this point in the litigation and is the amount that is more

than fair,  reasonable, necessary and consistent to what is allowed under the terms

of the contract with Avidigm and Mattson because arguably under the terms of the

contract all legal fee and costs of collection are to be awarded the Murrins.  The

contract provides, among other things, that "maker agrees to pay all costs of

collection, including reasonable attorney fees."  See Exhibit 3 page 2.  Mattson

executed a personal guarantee. See Exhibit 4.  Murrins complied with all notice

requirements to effectuate the liability and indemnity under the contract and the

guarantee.   See Exhibit 34 & 35

        22.    The total amount due and owing Plaintiffs adding all of the above is

$2,003,212.50 for which Plaintiffs request entry of judgment.

23.    That Plaintiffs obtained settlement agreements worth over $700,000 but as a result of post settlement negotiations the Murrins agreed to accept cash in stead of having to take payments and therefore accepted less, so the actual amount received was $695,000.00.  These settlements and the parties that settled are protected by confidential settlement agreements so the Murrins are prohibited from disclosure unless this court issues an order compelling disclosure pursuant to the terms of the agreements. However, Plaintiffs believe that Defendants are not entitled to any setoff for these amounts according to law where fraud is committed. This law is contained in the memorandum of law accompanying this declaration and is based upon the principal that persons that commit fraud are not entitled to obtain the benefits of other persons' payments. If the court mandates a deduction the Murrins would still be entitled to a judgment in the amount of $1,308.212.50. Declarant asks for judgment in the higher amount, or as an alternative in the lower amount as the court deems just and reasonable.

## Declaration Regarding Pleadings

24.    That Steven J. Mattson and Avidigm Capital Group were served with the Summons and Complaint on November 29, 2006 (Doc. No. 88).

25.    That Steven J. Mattson and Avidigm Capital Group never filed an Answer as required by the Court's Order of April 16, 2007 (Doc. No. 80).

26.     That Plaintiffs served a copy of the Court's Order of April 16, 2007, on counsel for Mattson and Avidigm on April 18, 2007 (Doc No. 85).

27.     That Plaintiffs personally served Mattson and Avidigm with the Sixth Amended Complaint on December 31, 2009 (Doc. No. 394).

28.     That neither Mattson nor Avidigm answered the Sixth Amended Complant.

29.     That the Clerk entered default against Mattson and Avidigm on February 5, 2010 (Doc. No. 400).

## **Declaration Regarding Default Judgment**

30.     That neither Mattson nor Avidigm is a minor or incompetent.

31.     That neither Mattson nor Avidigm is a member of the armed forces of the United States, and therefore the Soldiers and Sailors Act of 1940 does not apply.

32.     That on February 4, 2009, the Murrins filed documents attesting to the fact that Mattson was not in the military, is over the age of 18, and is competent (Doc. No. 398).

33.     That Exhibit 1 is a true and correct copy of Avidigm's Financial Statement provided to the Murrins and their account prior to the Murrins' investment in Avidigm in August, 2004.

34.     That Exhibit 2 is a true and correct copy of the Security Agreement between Avidigm and the Murrins dated August 31, 2004.

35.     That Exhibit 3 is a true and correct copy of the Secured Promissory Note between Avidigm and the Murrins dated August 31, 2004.

36.     That Exhibit 4 is a true and correct copy of the Personal Guaranty of Steven J. Mattson dated August 30, 2004.

37.     That Exhibit 5 is a true and correct copy of the Murrins' mortgage on Lots 23 and 23A, Rio Sheyenne Estates Addition, in part of N ½ of Section 4, Township 135 North, Range 52 West, and part of S ½ of Section 33, Township 136 North, Range 52 West, all in the County of Richland, North Dakota.

38.     That Exhibit 6 is a true and correct copy of Avidigm's audited financial statement.

39.     That Exhibit 7 is a true and correct copy of the Affidavit of Robert Gann.

40.     That Exhibit 8 is a true and correct copy of Avidigm Capital Group, Inc.'s profit and loss statement from its Quickbooks file contained on a CD obtained through Avidigm's attorney Benjamin Houge.

41.     That Exhibit 9 is a true and correct copy of the list of checks that Steven J. Mattson and Matthew Mosher received from Avidigm from September, 2003 to June 18, 2004.

42.     That Exhibit 10 is a true and correct copy of checks received by Steven J. Mattson from Avidigm's bank account at Lake Elmo Bank through June 18, 2004.

43.     That Exhibit 11 is a true and correct copy of checks received by Matthew Mosher from Avidigm's bank account at Lake Elmo Bank through June 18, 2004.

44.     That Exhibit 12 is a true and correct copy of a list of properties the Murrins received from Avidigm at the August, 2004, meeting showing equity available to secure them in the sum of $931,000.

45.     That Exhibit 13 is a true and correct copy of Warranty Deeds from Avidigm Capital Group, Inc. to Jason Fischer.

46.     That Exhibit 14 is a true and correct copy of a letter from Avidigm to the Murrins dated May 5, 2004.

47.     That Exhibit 15 is a true and correct copy of a letter from Avidigm to the Murrins dated August 24, 2004.

48.     That Exhibit 16 is a true and correct copy of the mortgage to Midwest Bank by Avidigm on the Rio Sheyenne Lodge property in Richland County, North Dakota.

49.     That Exhibit 17 is a true and correct copy of the Owners and Encumbrance Report on the Rio Sheyenne Lodge property in Richland County, North Dakota.

50.     That Exhibit 18 is a true and correct copy of portions of the deposition (statement under oath) of Phillip Watzke.

51.     That Exhibit 19 is a true and correct copy of a spreadsheet showing sales of properties from Avidigm Capital Group Inc. to Washington Financial and LaSalle Financial and Jason Fischer.

52.     That Exhibit 20 is a true and correct copy of a purchase agreement between Avidigm Capital Group and Washington Financial for $115,937.64.

53.     That Exhibit 21 is a true and correct copy of a purchase agreement between Avidigm Capital Group and Washington Financial for $943,200.00.

54.     That Exhibit 22 is a true and correct copy of a purchase agreement between Avidigm Capital Group and Washington Financial for $381,767.40.

55.     That Exhibit 23 is a true and correct copy of a Promissory Note between Avidigm Capital Group and LaSalle Financial for $470,380.95 dated August 19, 2004.

56.     That Exhibit 24 is a true and correct copy of a Promissory Note between Avidigm Capital Group and Washington Financial for $115,937.64 dated August 30, 2004.

57.    That Exhibit 25 is a true and correct copy of a Promissory Note between Avidigm Capital Group and Washington Financial for $943,200.00 dated August 30, 2004.

58.    That Exhibit 26 is a true and correct copy of a Promissory Note between Avidigm Capital Group and Washington Financial for $381,767.40 dated August 16, 2004.

59.    That Exhibit 27 is a true and correct copy of a Confirmation to the auditors that Washington Financial owed Avidigm Capital Group $1,440,950.04 as of August 31, 2004.

60.    That Exhibit 28 is a true and correct copy of a Promissory Note signed by Jason Fischer for $1,131,000.00 dated July 30, 2004.

61.    That Exhibit 29 is a true and correct copy of a Confirmation to the auditors that Jason Fischer owed Avidigm Capital Group $1,131,000.00 as of August 31, 2004.

62.    That Exhibit 30 is a true and correct copy of portions of the deposition of Linda Roxbury.

63.    That Exhibit 31 is a true and correct copy of the Affidavit of Richard Korinke.

64.    That Exhibit 32 is a true and correct copy of the indictment of Steven J. Mattson in US District Court, Case No. CR 07-191.

65.     That Exhibit 33 is a true and correct copy of the plea agreement of Steven J. Mattson in US District Court, Case No. CR 07-191.

66.     That Exhibit 34 is a true and correct copy of a letter from John Murrin to Avidigm and Mattson dated January 20, 2006.

67.     That Exhibit 35 is a true and correct copy of a letter from John Murrin to Avidigm and Mattson dated February 17, 2006.

68.     That Exhibit 36 is a true and correct copy of a list of the Murrins' expenses through June 10, 2008.

69.     That Exhibit 37 is a true and correct copy of the Amended and Restated Articles of Incorporation for Avidigm Capital Group, Inc.

70.     That Exhibit 38 is a true and correct copy of a portion of the appraisal of Rio Sheyenne Lodge property by Crown Appraisals dated February 24, 2005.

71.     That Exhibit 39 is a true and correct copy of the Affidavit of Dan Coutolenc dated May 23, 2008.

72.     That Exhibit 40 is a true and correct copy of the Preliminary Report of Bradley R. Mickelson dated April 12, 2008.

73.     That Exhibit 41 is a true and correct copy of the Affidavit of Bradley R. Michaelson Regarding Avidigm Capital Group, Inc. Financial Statement Audit as of August 31, 2004.

74.     That Exhibit 42 is a true and correct copy of the

Declaration/Affirmation of DeVonna K. Murrin dated August 12, 2007.

75.     That Exhibit 43 is a true and correct copy of the Affirmation of Dan

W. Coutolenc dated April 12, 2008.

76.     That Exhibit 44 is a true and correct copy of the Warranty Deed

between Rio Sheyenne Lodge LLP and Avidigm Capital Group for property in

Richland County, North Dakota dated November 23, 2004 and filed with Richland

County Recorder on December 9, 2004.

77.     That Exhibit 45 is a true and correct copy of the Settlement Statement

between Rio Sheyenne Lodge LLP and Avidigm Capital Group for settlement date

of November 23, 2004, for property in Richland County, North Dakota.

78.     That Exhibit 46 is a true and correct copy of the Affidavit of Bradley

P. Mickelson Regarding Accredited Financial Services Check Activity dated May

30, 2008.

I declare under penalty of perjury that this is true and correct to the best of

my knowledge and understanding.


Dated: ___2/10/10_____          __/s/ John O. Murrin_____
                                  John O. Murrin